**BROTHERHOOD OF RAILWAY AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES et al. v. UNITED TRANSPORT SERVICE EMPLOYEES OF AMERICA.**

No. 8374.

United States Court of Appeals for the District of Columbia.

Argued June 17, 1943.

Decided Aug. 2, 1943.

818

Mr. Willard H. McEwen, of Toledo, Ohio, with whom Messrs. Edward C. Kriz, of Washington, D. C., and Frank L. Mulholland, of Toledo, Ohio, appeared on the brief, for appellants.

Mr. James A. Cobb, of Washington, D. C., with whom Messrs. Perry W. Howard and George E. C. Hayes, both of Washington, D. C., appeared on the brief, for appellees.

Before GRONER, Chief Justice, MILLER, Associate Justice, and EICHER, Chief Justice of the United States District Court.

EICHER, Chief Justice of the District Court.

This appeal calls for the interpretation of the collective bargaining mechanics of the Railway Labor Act.

About 45 station porters (red-caps) in the employ of the Saint Paul Union Depot Company, Saint Paul, Minnesota, after organizing as a local chapter of the appellee, the United Transport Service Employees of America, (hereinafter called "United") a labor union composed of "Red-Cap" employees of various railroads and terminal stations throughout the United States, applied to their employer for the execution of a working and wage agreement, and joined with "The United" in requesting recognition of "The United" as their bargaining agent. Upon refusal, first on the ground that "Red-Caps" were not regarded as "employees" by the Interstate Commerce Commission, and later because the rights of the "Red-Caps" were covered by a previously executed working agreement with the appellant, the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, (hereinafter called the "Brotherhood") the services of the National Mediation Board (hereinafter called the Board) were invoked to investigate the dispute over said representation. The Board dismissed the application on the ground that station porters "are part of the craft or class of clerical, office, station, and storehouse employees and not a separate class or craft for the purposes of the Railway Labor Act" and that "No dispute over representation has been found by the Board to exist among the craft or class of * * * (such) employees in the service of the company."

This action, brought by United and five of the employees suing as representatives of the others, similarly situated, to review said dismissal order, followed, the Brotherhood intervening as a defendant. The Court below granted the relief prayed for, and adjudged the dismissal order of the Board to be void and ineffective, the "Red-Caps" to be a separate and distinct class or craft, and required the Board to certify the appellee, "United", to the Saint Paul Union Depot Company as the bargaining agent for the "Red-Caps" in its employ.

From said judgment the Board perfected no appeal, and the intervening Brotherhood is the sole appellant. In Brotherhood of Railroad Trainmen v. National Mediation Board, 66 App.D.C. 375, 88 F.2d 757, 758, we also reviewed an order of the Board, and here as there the question is "whether the decision of the Board * * * was a mistake of law so clearly erroneous as to make the decision arbitrary."

Before considering the statute, we deem it appropriate to summarize some conceded facts:

(1) The working agreement entered into in 1921 between the Saint Paul Union Depot Company and employees represented by the Brotherhood did not list station porters or "Red-Caps".

(2) As late as 1938 the General Superintendent of the Depot Company took the position that the Saint Paul "Red-Caps" were not employees within the terms of the Railway Labor Act because they had not yet been held by the Interstate Commerce Commission to be employees.

(3) After they were held by the Interstate Commerce Commission to be employees the Depot Company took the position that the "Red-Caps" were covered by the working agreement with the Brotherhood entered into in 1921.

(4) The Saint Paul "Red-Caps" have at no time designated the Brotherhood as their

bargaining agent, but have in fact unanimously so designated the United.

(5) The Board has recognized the United as craft organization acting for "Red-Caps" either by actual certification to, or through knowledge of executed agreements with upwards of twenty-one railroads and station companies.

(6) The Board found that the Saint Paul "Red-Caps" devote a preponderance of time to "red-cap" or station porter service as distinguished from janitor or custodial service.

(7) The Saint Paul "Red-Caps" are all colored and because of this are not eligible for membership in the Brotherhood.

(8) No election has been at any time held at which the Saint Paul "Red-Caps" have had the opportunity to vote for a bargaining agent.

Turning to the controlling statutory provisions, we quote from the Railway Labor Act, as follows: From U.S.C.A., Title 45, Sec. 152, fourth paragraph: "Employees shall have the right to *organize and bargain* collectively through representatives *of their own choosing.* The majority of any craft or class of employees shall have the *right to determine* who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers, or agents shall *deny or in any way question the right* of its employees to join, organize, or assist in organizing *the labor organization of their choice,* and it shall be unlawful for any carrier to *interfere in any way* with the organization of its employees. * * *" [Emphasis supplied]

From Section 152 aforesaid, Ninth paragraph: "If any dispute shall arise among a carrier's employees as to who are the representatives of such employees *designated and authorized in accordance with the requirements of this chapter,* it shall be the duty of the Mediation Board * * * to investigate such dispute and to certify * * * the name * * * of the * * * organizations * * * designated. * * * In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier." [Emphasis supplied]

From Title 45, aforesaid, Section 151, Fifth paragraph: "The term 'employee' as used herein includes every person in the service of the carrier * * * who performs any work defined as that of an employee * * * in the orders of the Interstate Commerce Commission * * *: Provided, however, that no occupational classification made by order of the Interstate Commerce Commission shall be construed to *define the crafts* according to which railway employees may be organized *by their voluntary* action, nor shall the jurisdiction or powers of such employee organizations be regarded as in any way *limited or defined by the provisions of this chapter* or by the orders of the Commission." [Emphasis supplied]

It will be observed that Congress granted employees certain positive rights, both affirmative and negative in character. They have the right to organize *and* bargain collectively through representatives of their own choosing, which carries the corollary that the right to organize is essential to the right to bargain collectively. And yet the employees in the case at bar are ineligible to organize with the only labor union that their employer will recognize as their bargaining agent. Again, the majority of any craft or class shall have the right to determine who shall be their representative, which means the majority of the votes cast at an election, provided a majority of those eligible to vote have participated. Virginian R. Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789. Clearly, this implies a right in each employee to participate as a member of a craft or class, in such determination. But the employees in the case at bar have had their representative designated for them by their employer without even the opportunity to exercise the right of being in the minority or to fail to vote if they should so choose. Still again, employees have the right to be in no way questioned in their choice of labor organization. The employer's refusal in this case to deal with the only labor organization these employees could join and that they did designate as their representative certainly violates both the spirit and the letter of the Fourth paragraph of Section 152.

Following such refusal and when the powers of the Mediation Board are invoked, we find in the Ninth paragraph of Section 152 that the mediation duties imposed on the Board are directed to "dis-

putes * * * as to who are the representatives * * * designated and authorized *in accordance with the requirements of this chapter."*

■ Thus the Mediation Board is enjoined to perform its duties in the light of all rights, express or implied, that are preserved to employees by the Act. A further significant directive to the Board is found in the Fifth paragraph of Section 151 where it is declared that even an order of the Interstate Commerce Commission shall be given no weight in defining "the crafts according to which railway employees may be organized *by their voluntary action."*

■ We are convinced that the Mediation Board, when its good offices were invoked in this case, was called upon to do more than to reach a decision on a mere issue of fact, which, if supported by evidence, would be conclusive upon the Courts. To say in a vacuum that the Saint Paul "Red-Caps", historically or by definition or both, belong to the same craft or class as station laborers, even tho' less than half of their time is devoted to janitor or custodial work, is one thing. To say it in the light of the resultant deprivation of rights preserved to them by the statute, is quite another thing. It is a mixed question of law and fact that presents itself for solution. If the factual decision arrived at is found to be contrary to law, it is the duty of the Courts so to declare.

In Brotherhood of R. R. Trainmen v. National Mediation Board, 66 App.D.C. 375, 88 F.2d 757, while conceding the Board's large discretionary powers in the conduct of elections for the appointment of representatives between the carrier and the craft, this Court said (page 379 of 66 App.D.C., 88 F.2d at page 761): "If the matter of interest alone is to be adopted as the test, we should hesitate to hold that an emergency conductor whose service time on the railroad is spent 50 per cent. as conductor and 50 per cent. as brakeman should not be classified, for the purposes of agreement making, as a conductor." This observation is pertinent to the conceded fact in the case at bar that the preponderant service of the employees was as "Red-Caps" or station porters.

The opinion of this Court in National Federation of Railway Workers v. National Mediation Board, 71 App.D.C. 266, 110 F.2d 529, is without bearing on the issue presented to us in the instant case. The coach cleaners there concerned were deprived of no statutory rights, by either the government or their employers. The designated representative, it is true, was a labor organization to which some of the coach cleaners could not belong, but it became the designated representative because a majority of the coach cleaners voted for it and it could continue only so long as they desired it.

■ We are constrained to hold, therefore, that the Board misinterpreted the law applicable to the facts in this case and that its order dismissing appellee's application to be certified as the bargaining agent for the employees concerned, was contrary to law.

■ Full recognition is accorded to the necessarily large discretion vested in the administrative agency in determining the occupational boundaries that comprehend a craft or a class. If, as suggested in the Board's opinion, the employees concerned were, in fact, merely a minority group of an established craft or class that did have a voice in the determination of policy for the entire craft or class, who are seeking without statutory reason to set themselves up as a separate craft or class, the problem presented to us would be easy of solution and we might in good conscience join the Board in its admonition that there be more cooperation between the complaining employees and the members of the intervening Brotherhood;—in other words, that they both "go and sin no more."

As we have pointed out, however, the record raises questions of law and fact that deserve better than cavalier disposition by both the administrative and the courts, and the parties are entitled to have them determined in accordance with the due processes of the law.

The judgment of the District Court is correct and is therefore affirmed.

GRONER, C. J. (concurring).

As I think the decision here turns upon a single point, wholly unaffected by any of the questions which ordinarily are to be found in controversies over the selection of a bargaining agent for crafts or classes of railway employees, I have thought it desirable to express my views on the subject separately.

The case arises out of a quarrel between two national railway labor unions as to

which is entitled under the provisions of the Railway Labor Act to represent, for collective bargaining purposes, a group of forty-five negro employees of St. Paul Union Depot Company, carried on that Company's roster as station porters. After full hearing, the National Mediation Board, whose services had been properly invoked, found in favor of the Brotherhood of Railway & Steamship Clerks, one of the parties to the contest, and held that since the porters were formerly considered by the Depot Company as part of the craft or class of clerical, office, station and storehouse employees represented by the Brotherhood and not as a separate craft or class which, within the intent of the Act, is capable of speaking for itself or choosing its own representative, the established order of things should be continued.

On petition to review, the District Court reversed the Board and decided the contest in favor of the other party, United Transportation Employees of America (Red-Caps). In reaching this conclusion the Court found as a fact that the majority of the porters' time was served in "redcap" service; that they were not members of Brotherhood and had not designated it as their bargaining agent; that as a separate craft or class in the circumstances then existing they were entitled to make their own designation and, having unanimously indicated and desired to have United as their bargaining agent, the Board should certify accordingly.

The essential facts are not in dispute and show that the porters are and have long been regularly employed at the railroad station in St. Paul and their time and pay divided between what is considered red-cap work and custodial work; the former consuming about five hours of their daily time, the latter about three hours, and their wages computed on an hourly basis, some being paid for three hours a day, others for longer, and all receiving the balance of their income from gratuities from passengers using the railroad station.

United is a national union of "Red-Cap" station employees of many American Railway Companies and the forty-five men employed by the Depot Company comprise a local chapter of that union. Individually and as members of that organization they duly requested the Depot Company to enter into a working agreement with United in their behalf, and when this was denied invoked the mediation of the Board. Considered in the light of these facts, the single question, as I view the matter, is whether the porters who at one time were regarded by the Depot Company as custodial employees and for lack of a better classification considered by it as within the ambit of employees represented by the Brotherhood and dealt with accordingly, should now and for all time be compelled against their consent to remain subject to that jurisdiction in their relationships with their employer. In one of the earlier appeals from the Board,[1] involving a contest between a railway conductors' union and a brakemen's union, in which the question was whether brakemen (who were also, in the exercise of their seniority, part-time conductors) were entitled to vote in the election of a bargaining representative, we said that the amount of time consumed in the one service as against the other might properly be considered in determining the question, and we indicated that we should be slow to hold that a part-time conductor, whose service time on the railroad is spent fifty per cent as conductor and fifty percent as brakeman was not entitled to be considered, for bargaining purposes, a conductor. But I think that neither that question nor the question of the precise or exact meaning of the words "craft or class" and of whom they shall be composed, needs to be decided in this case. And this for the reason that here there is admitted to exist a totally different situation from any contemplated by the Act, and which, so far as I know, is unique. And this grows out of the fact, as we have seen, that the Brotherhood, designated by the Board as the bargaining agent of the porters, is a white organization which does not permit membership by the colored employees of the railroads. As a result, the effect of the action of the Board is to force this particular group of employees to accept representation by an organization in which it has no right to membership, nor right to speak or be heard in its own behalf. This obviously is wrong and, if assented to, would create an intolerable situation. That the rules of the Brotherhood make negroes ineligible to membership is not a matter which concerns us, but that the Brotherhood, in combination with the employer, should force on these men this proscription and at the same time insist that Brother-

---

[1] Brotherhood of Railway Trainmen v. National Med. Board, 88 F.2d 757, 66 App.D.C. 375.

hood alone is entitled to speak for them in the regulation of their hours of work, rates of pay and the redress of their grievances is so inadmissible, so palpably unjust ` and so opposed to the primary principles of the Act as to make the Board's decision upholding it wholly untenable and arbitrary. The purpose of the Act, as is apparent on its face, and as has been recognized and confirmed by the Supreme Court and this Court in many decisions, is to insure freedom of choice in the selection of representatives. While it is true that this purpose has been held to yield, when necessary, in the interest of uniformity of classification in accordance with established custom, nothing in the Act nor in its construction by the courts can be found to justify such coercive action as to force upon any class of employees representation through an agency with whom it has no affiliation nor right of association. It is, therefore, of no consequence that the porters were at one time dependent upon Brotherhood as their spokesman with the railroad, for that never was a trusteeship of their own making. To perpetuate it by law would be to impose a tyranny in many respects analogous to "taxation without representation." And if anything is certain, it is that the Congress in passing the Act never for a moment dreamed that it would be construed to diminish the right of any citizen to follow a lawful vocation on the same or equal terms with his neighbor. In this view, to enforce the Board's decision would be contrary to both the word and spirit of our laws.